# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RILEY T. GUNTER, | ) | **CASE NO. 8:21CV281** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF OMAHA, *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |


## BRIEF IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT


Prepared and submitted by:
POTSO MAHLANGENI-BYNDON Bar Number: 43031
BYNDON LAW
Attorney for Plaintiff
2016 Fowler Avenue
Omaha, Nebraska 68110
(402) 570-1287
potso@byndonlaw.com

**INTRODUCTION**

PLAINTIFF, RILEY T. GUNTER, submits this brief in opposition of Defendants' Motion for Summary Judgment. Based on the arguments below, Defendants' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED IN ITS ENTIRETY.

## I. FACTUAL STATEMENT

### a. *Mr. Riley "Terry" Gunter—Omaha's sole African American Stationary Engineer.*

In 2013, the City of Omaha hired African American Riley "Terry" Gunter as a Stationary Engineer I. (Gunter Depo. 11:18-20 ). Mr. Gunter operated boilers, gas, oil-fired steam plants, waste heat steam boilers, air handlers, and ventilation systems in City of Omaha buildings. From 2018, he was the sole African American Stationary Engineer. (Exhibit 2, p. 1; Exhibit 9, pp. 5, 13 (Interrogatory 16)).

Mr. Gunter worked as a Boiler Technician at Tyson Foods, Inc. from 2017 to ensure safe product production, handling, and safety. He also worked at Immanuel Health Systems, a senior living community, where he maintained boilers and heating systems in individual units. His job at Immanuel Health required him to be proficient in boiler management due to the aging clientele's increased vulnerability to burn injury. Prior to this, Mr. Gunter worked at Omaha Public Schools and Council Bluffs Community Schools, overseeing boiler maintenance to create a safe, productive, and learning-conducive environment for the district's children, teachers, staff, and administration. (Exhibit  3 - Gunter Aff. ¶2).

Mr. Gunter has over 35 years of experience in boiler engineering, regulation, and safety. He holds a 3rd Grade stationary engineering license since 1996, which is issued to qualified individuals in Nebraska to demonstrate their skills in operating hot water boilers, steam generators,

electrical motors, and identifying smoke causes. (Exhibit 3 - Gunter Aff. ¶2-3). This license is used for the City of Omaha—operating boilers in the steam plant, heating and air conditioning units, and he holds an EPA license in heating and air conditioning recovery for refrigerants. (Gunter Depo. 7:20-25). Mr. Gunter received positive reviews from his supervisor, Mr. Ray Hutzell. In a Performance Appraisal, Hutzell praised Gunter's excellent equipment maintenance, commitment to plant safety, and experience in boiler operations. (Exhibit 4, pp. 2-3, 6).

### b. *Mr. Gunter's Complaints of Discriminatory Conduct.*

On October 10th and 11th, 2018, Mr. Gunter filed complaints of harassment and discrimination at the Papillion Creek Wastewater Treatment Plant. He claimed that a white co-worker intentionally broke his locker lock. He reported the incident to three individuals: Plant Manager David Sykora, City of Omaha Human Resources Director Tim Young, and Union President Tony Burkhalter. (Exhibit 3 - Gunter Aff. ¶4; Sykora Depo. 18:1-13). The Union Local 251 investigated under *Article 24 Non- Discrimination Section 4:* (Exhibit 5 p. 1). Mr. Tim Young took over the complaint on January 9, 2019, but Mr. Gunter did not receive any notification or disposition of his discrimination and harassment claim. (Sykora Depo. 21:12-23:17; Exhibit 3 - Gunter Aff. ¶6). On January 17, 2019, Mr. Young called Gunter's allegations frivolous. (Exhibit 5, p. 3).

### c. *Mr. Gunter Suffers a Work-Related Injury.*

On November 30, 2018, Mr. Gunter sustained a left shoulder injury while lifting a 50-pound bag of salt. (Gunter Depo. 68:7-10). He was referred to Dr. Dubrow—an American Orthopedic Surgeon, for treatment. Dr. Dubrow prescribed conservative physical therapy to address and heal the injury. (Gunter Depo. 45:10-14; 71:19-22; Dubrow Depo. 4:19-24).

Dr. Dubrow conducted a physical examination of Mr. Gunter's shoulder injury during his initial treatment visit on January 29, 2019. Dr. Dubrow diagnosed Mr. Gunter with a left shoulder rotator cuff tear. (Dubrow Depo. 13:3-11). Dr. Dubrow determined that Mr. Gunter could return to work if he followed movement restrictions to his left arm, including no overhead reaching. (Exhibit 6, p. 4; Dubrow Depo. 14:17-25).

On April 17, 2019, an MRI of Mr. Gunter's left shoulder revealed a small intrasubstance tear of the rotator cuff. (Dubrow Depo. 15:12-17; 16:9-19). Dr. Dubrow opined that the tear did not necessarily require surgery to repair the rotator cuff, as it was only a partial tear. Dr. Dubrow opined that it was in Mr. Gunter's best interest to avoid surgery. (Dubrow Depo. 19:17-21). On April 30, 2019. Mr. Gunter may return to work on the same light duty restrictions until a Functional Capacity Examination provides further details. (Exhibit 6, p. 5).

On August 8, 2019, Dr. Dubrow recommended the following permanent restrictions.

1. [Mr. Gunter] may lift and carry 50 pounds on an occasional basis and 30 pounds on a frequent basis at waist level or below.

2. Lifting objects to the shoulder level should be restricted to 35 pounds on an occasional basis, and 20 pounds on a frequent basis.

3. Overhead lifting should be restricted to an occasional basis of 15 pounds or less.

4. No prolonged or repetitive overhead work with left upper extremity to limit aggravation of symptoms. (Exhibit 6 pp. 7-8, Dubrow Depo. 25:14-27:1).

On October 29, 2019, Mr. Gunter returned for treatment, stating that he could perform all duties at work and feels he has enough strength to perform previously restricted duties. (Dubrow Depo. 30:24:31:10). Dr. Dubrow conducted a thorough examination of Mr. Gunter, observing an improvement in his strength testing. His rotator full strength testing improved to 5 out of 5,

compared to 4 out of 5. (Dubrow Depo. 32:12-17). Dr. Dubrow recommended lifting Mr. Gunter's restrictions and concluded that a Functional Capacity Examination was unnecessary due to the provocative testing that did not cause pain. (Dubrow Depo. 33:15-34:4). Dr. Dubrow assessed Mr. Gunter's improvement based on both objective reasoning and subjective self-report, stating that he was substantially better and his pain had significantly reduced since the date of his injury nearly a year earlier. (Dubrow Depo. 34:12-19; 34:20-25).

Dr. Dubrow recommended Mr. Gunter return to work duties and lifting all movement restrictions due to his medical improvement. (Exhibit 6, p. 12; Dubrow Depo. 35:1-20).

### d. *The Discriminatory "Work List"—Tangible Change in Duties.*

From November 30, 2018, to February 2019, Mr. Gunter performed boiler operations, making rounds, and checking boilers at the Papillion Creek Wastewater Treatment Plant. (Gunter Depo 73:25-74:3). He returned to work in March 2019. In March 2019, a flood occurred, causing temporary displacement of the plant. Gunter Depo. 75:16:18). All stationary engineers, including Mr. Gunter, were re-assigned to the South 24th Street office, performing HVAC work for City of Omaha buildings. Mr. Gunter was assigned to "ride-along" and straighten books on bookshelves. (Gunter Depo. 75:23:76-2; 76:3-25; 77:23-78:2; Sykora Depo. 72:9-18 )

In April 2019, the Papillion Creek Wastewater Treatment Plant was restored for primary treatment after the flood, and by May 2019, it was operational for secondary treatment. (Sykora Depo. 72:19-73:1). Stationary Engineers monitored the rebuilding process, ensuring proper functioning of air handlers for tunnel workers. (Sykora Depo. 101:13-102:10). From April 2019 to August 31, 2019, Mr. Sykora was unable to identify an employee assigned to janitorial tasks for clean-up after the flood, only identifying tasks undertaken by hired contractors. (Sykora Depo.

73:2-75:3).

Mr. Gunter was on Family Medical Leave Act (FMLA) from June 23, 2019 to September 17, 2019. (Gunter Depo. 84:21-85:2). On his return, his supervisors assigned him a "Work List" of 193 distinct janitorial tasks, which included picking up trash, taking out trash, scrubbing floors, mopping floors, cleaning urinals, sweeping floors, washing cars, cleaning cobwebs, cleaning raw sewage, cleaning outdoor grounds, scrubbing walls, scrubbing and disinfecting toilets, vacuuming, and cleaning car windows with Windex. (Gunter Depo. 95:19-25; Exhibits 7; 17).

Mr. Gunter was required to do a full eight-hour day of janitorial work daily. (Sykora Depo. 75:10-76:9). Supervisor Mr. Mahoney claimed that the janitorial "Work List" was created in 2016 by Mr. Sykora—but it was not assigned to Mr. Gunter until September 18, 2019. (Mahoney Depo. 20:14-20). Mr. Sykora, without functional capacity testing experience, found that 193 janitorial jobs created two years before Mr. Gunter's injury accommodated his restrictions without adding or subtracting a single job duty. (Sykora Depo. 10:1-14; 91:23-92:9). Mr. Mahoney's stated the "Work List" contained nothing outside Mr. Gunter's restrictions. (Mahoney Depo. 21-9:11).

The janitorial "Work List," a PDF document, contains a date stamp of September 11, 2019, seven days before Mr. Gunter returned to work on September 18, 2019. Mr. Sykora cannot explain how he edited the PDF file, and the "Work List" was created using Microsoft Word 2019, which did not exist in 2016. (Exhibit 8).

The City of Omaha also identified 12 white employees who suffered an injury at work from 2016 to 2019, requiring a modification of their work duties. (Exhibit 9, pp. 1-2, 5, 7-15 ((Interrogatory 2, 3, 14). None of them were assigned the janitorial "Work List" (Exhibit 9, pp. 1-2 (Interrogatory, 3, 6 and 14).

Mr. Gunter found the newly assigned duties discriminatory and degrading, as he was not

allowed to perform any engineering duties in his job description as a Stationary Engineer I or perform any physically accommodating duties consistent with those assigned to the 12 white employees who were injured from 2016 to 2019. (Gunter Depo. 119:20-120:2). Mr. Gunter also found that none of the janitorial duties on the "Work List" were consistent with his engineer duties, as he has never done any of these duties since commencing employment as an engineer with the City of Omaha in 2013. (Gunter Depo. 120:3-12). None of the job duties described in the janitorial "Work List" were listed in Mr. Gunter's job description, nor do these duties fall within the scope of an engineering duties. (Gunter Depo. 124:25-125:18).

e. ***The Discriminatory Work List—Defendants 'Accommodated' Mr. Gunter's Shoulder Injury by Assigning him Arduous Work.***

The "Work List" assigned to Mr. Gunter by supervisors did not meet Dr. Dubrow's restrictions. (Gunter Depo. 120:23-121:4; 121-25:122-7). Mr. Sykora, the Plant Manager who created the list in 2016, derived the duties from a Labor Position, which required physical and heavy manual labor. (Sykora Depo 34:2-17; 34:21-35:8; 77:22-24; 78:13-23). The essential job functions in the list fall under the Labor Position. (Sykora Depo. 79-4:11). The Labor Position Mr. Sykora used to create the "Work List" is described as a position that requires "physical at times heavy manual labor." (Exhibit 10 p. 1).

The exertional requirements for the Labor Position are:

Ability to move objects weighing up to one hundred (100) pounds of force up to 33% of the time….(Exhibit 10 p. 2)

The external requirements for Mr. Gunter's position as a Station Engineer I:

Ability to move objects weighing fifty (50) to one hundred (100) pounds of force up to 33% of the time…(Exhibit 2 p. 2)

The exertional requirements of a Labor position for which the janitorial "Work List" was derived requires greater exertional strength than Mr. Gunter's engineer position—yet his supervisors, who have no training, education or experience in functional capacity testing, assigned him this arduous work as accommodating "light duty." (Sykora Depo. 10:1-14; 91:23-92:9; Mahoney Depo. 48:25-49-9; Hutzell Depo. 81:22-82:9).

### f. *Mr. Gunter follows the advice and counsel of his Union Representative—Tony Burkhalter.*

Mr. Gunter complained about the janitorial "Work List" and its arduous nature, stating it was disgraceful. He requested clarification on how the list could be described as accommodating light duty. (Gunter Depo. 97:15:98-3). Mr. Gunter considered the list discriminatory and described it as physically hard. (Gunter Depo. 36:1-10; 119:6-120:15; 94:23-94:1). Mr. Gunter also noted that his supervisors, Hutzell, Mahoney, and Sykora, refused to memorialize this "Work List", into the official Work Order system used to assign employees related duties. (Gunter Depo. 98:4-18).

### g. *Defendants Constructively Discharge Mr. Gunter.*

Mr. Gunter, an engineer, was unable to return to his engineering occupation and was forced to continue physically arduous janitorial work. (Exhibit 3 - Gunter Aff. ¶7). Mr. Gunter turned to Local 251 union representative Tony Burkhalter—he advised Mr. Gunter not to accept a reasonable accommodation but to go to his treating doctor, Dr. Dubrow, for a professional medical evaluation/opinion on Mr. Gunter could perform his engineering job. (Exhibit 3 - Gunter Aff. ¶7; (Gunter Depo. 50:6-51:4). Mr. Burkhalter's stated that Mr. Gunter accepting a reasonable accommodation would allow the City of Omaha to fire him without legal consequence if they could not accommodate him. (Gunter Depo. 51:16-52:24) However, the Union Local 251's

attorney stated that a reasonable accommodation is not necessary if Mr. Gunter can fully perform his engineering job as described in his job description. (Gunter Depo. 51:16-52:24)

On October 23, 2019, the City of Omaha's Labor Relations Director, Mr. David Grauman, sent Mr. Gunter a certified letter stating that Dr. Dubrow's restrictions prevented Mr. Gunter from performing essential functions of his engineer position, which requires substantial upper body strength, frequent lifting, and moving objects weighting up to 100 pounds. The City of Omaha left Mr. Gunter with two options: apply for retirement (disability) or resign. If Mr. Gunter failed to exercise these options by November 15, 2019, the City of Omaha would proceed with separation of employment. (Exhibit 14 pp 1-2).

On October 29, 2019, Mr. Gunter returned to Dr. Dubrow to provide an expert opinion on his ability to perform his duties as a Stationary Engineer I. Dr. Dubrow examined Mr. Gunter and in his professional opinion, lifted Mr. Gunter's restrictions, but the City of Omaha ignored it. (Gunter Depo. 87:6-20; 88:8-18; Exhibit 6, p. 12; Dubrow Depo. 35:1-20; Exhibit 3 - Gunter Aff. ¶8)). The

On October 30, 2019, Mr. Zach Wagner, City of Omaha Human Resource Technician, was informed by Dr. Dubrow's nurse, Ms. Reineke-Wulf that Mr. Gunter was seen by Dr. Dubrow and that the restrictions were lifted, and a full duty work was provided. (Exhibit 15, p. 1). Ms. Reineke-Wulf further noted a full duty note was appropriate and that Mr. Gunter could return to his normal workload.  On November 7, 2019, Ms. Reineke-Wulf informed Mr. Wagner that Dr. Dubrow had said that Mr. Gunter could perform all of his job duties and that all restrictions were discontinued. (Exhibit 14). When Mr. Gunter again asked his supervisors to return to his job as an engineer, the City of Omaha ignored his request and continued to force Mr. Gunter to, instead, do the physically arduous labor of a janitor as laid out in the "Work List". (Exhibit 16, pp. 3).

The City of Omaha did not accept Dr. Dubrow's expert opinion, so they scheduled a "Fit-for-Duty" exam for Mr. Gunter four days after the City of Omaha would proceed with separation of employment, as outlined in the October 23, 2019, letter. (Exhibit 16, p. 2). Mr. Gunter felt cornered and resigned, as the exam was scheduled after the separation. Failure to retire or resign by November 15, 2019, would result in termination, thus forfeiting his $24,000 pension. (Exhibit 3 - Gunter Aff. ¶9) Resignation allowed him to cash out his pension without withholding or forfeiture. On November 14, 2019, Mr. Gutner resigned. (Exhibit 3 - Gunter Aff. ¶9; Gunter Depo. 52: 2-13).

**h.** ***Breach of Contract***

In November 2018, Mr. Gunter completed Open Benefits enrollment for $20,000 in Voluntary Spousal Life Insurance for his wife, Ms. Carol Gunter. (Exhibit 3 - Gunter Aff. ¶10) The insurance was approved for $20,000 and effective on January 1, 2019. (Gunter Depo. 110:14-24; Gunter Aff. ¶10; Exhibit 18, pp. 1-2), Mr. Gunter received an enrollment confirmation from the City of Omaha with $11.00 of earnings as consideration. (Exhibit 18, p. 3). From January 27, 2019, $11.00 was deducted from Mr. Gunter's paycheck in consideration of the insurance. (Exhibit 18, p. 4). He was never explicitly informed that he had to fill out EOI to obtain the insurance. (Exhibit 3 -Gunter Aff. ¶10).

On February 4, 2019, the City of Omaha provided Mr. Gunter with oral and written confirmation of his $20,000 Voluntary Life Insurance. (Exhibit 18, pp. 5-6, 8). On February 9, 2019, Mr. Gunter wife passed away. Mr. Gunter attempted to collect under his policy by submitting his wife's death certificate. Mr. Gunter was told he had no life insurance. Considering the City of Omaha's error, Minnesota Life/Securian agreed to pay out Mr. Gunter's claim, only if the City of Omaha would reimburse them. (Exhibit 18, p. 10). Mr. Tim Young, decided not to not pay Mr.

Gunter's claim, earlier describing Mr. Gunter as a "problematic" employee. (Exhibit 18 pp. 8, 11-12). Mr. Gunter's $20,000 Voluntary Life Insurance Claim was denied. (Exhibit 18, pp. 11-12)

### i. _Mr. Gunter Signs a Settlement and Release_

On the day of Mr. Gunter's wife's funeral, he received notification from the City of Omaha that there was did not have insurance claim. Mr. Gunter was in a state of shock, he made call calls, researching, going back and forth with various employees within the City of Omaha. In order to proceed with his wife's funeral, he made a promise-to-pay to the funeral home on credit—based on the life insurance policy. Mr. Gunter got a loan from a credit union for funeral associated expense. From February 2019 to June 2019, Mr. Gunter went back and making phone calls to city HR—and he was told that there was no coverage (Gunter Depo 109:2-110-13). By June 2019 the funeral home was requesting payment for services rendered. (Exhibit 3 - Gunter Aff. ¶13). Mr. Young suggested that Mr. Gunter submit the bill for the funeral expense and in June of 2019, Mr. Young met Mr. Gunter face to face and presented him with check for only the funeral expense. Mr. Gunter's only option at the time was to get what was offered by Tim Young, he had no choice. (Exhibit 3 - Gunter Aff. ¶13; Gunter Depo 115:22-116:14).

### STANDARD OF REVIEW

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the nonexistence of any genuine issue of material fact. Fed. R. Civ. P. 56(c); _Adickes v. S.H. Kress & Co_., 398 U.S. 144, 157 (1970). Therefore, if the defendant does not meet its initial burden with respect to an issue, summary

judgment must be denied, notwithstanding the absence of opposing affidavits or other evidence. *Adickes, 398* U.S. at 159-60; *Cambee's Furniture, Inc. v. Doughboy Recreational, Inc.*, 825 F.2d 167, 173 (8th Cir. 1987).

Facts are viewed in the light most favorable to the nonmoving party, "in order to defeat a motion for summary judgment, the non-moving party cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." *Carter v. St. Louis University*, 167 F.3d 398, 401 (8th Cir. 1999); *Ghane v. West*, 148 F.3d 979, 981 (8th Cir. 1998). While there is no discrimination case exception to the application of Fed.R.Civ.P. 56, "we must exercise particular caution when examining the factual question of intent to ensure that we dutifully extend all justifiable inferences in favor of the non-moving party." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006) (citations omitted).

In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations. *Kenney v. Swift Transp. Co.,* 347 F.3d 1041, 1044 (8th Cir. 2003).

Summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." *Mayer v. Nextel West Cor*p., 318 F.3d 803, 806 (8th Cir.2003) (quoting *Keathley v. Ameritech Corp.,* 187 F.3d 915, 919 (Neb. 1999)).

## II. ARGUMENT

1. ### RACE DISCRIMINATION: Title VII, NFEPA, §1981[1]
   (Cause of Action 8-10)

Plaintiff starts with his Discriminations claims, as they are the most factually dense and they provide pretext arguments which are incorporated into FMLA—Retaliation and Title VII—

---

[1] NFEPA is patterned after Title VII and Nebraska courts have generally looked to federal decisions to analyze claims brought under that act. *See, e.g., Leiting v. Goodyear Tire & Rubber Co*., 117 F. Supp. 2d 950, 955 (D. Neb. 2000); *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688, 693 (Neb. 1999).

Retaliation claims. Claims of discrimination Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer "…to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Claims of discrimination brought under 42 U.S.C. § 1981 are analyzed in the same manner as discrimination claims brought under Title VII. *Al-Zubaidy v. TEK Industries, Inc*., 406 F.3d 1030, 1039 (8th Cir. 2005).

Indirect evidence may prove discrimination through the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff must first demonstrate the ability to prove the four elements of a prima facie case, which slightly varies depending upon the alleged adverse employment action. *Krenik v. Cnty. Of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A prima facie case is established where (1) the plaintiff is a member of a protected class, (2) the plaintiff is qualified to perform the job**,** (3) the plaintiff suffered an adverse employment action, and (4) the plaintiff was treated differently than similarly situated persons outside of the protected class. *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000). The prima facie case, in the absence of an explanation from the employer, creates a rebuttable presumption of discrimination. *Krenik, 47 F.3d at 958.*

Once the prima facie case is established, the burden shifts to the defendant to articulate a non-discriminatory reason for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993). If the defendant articulates such a reason, the plaintiff must respond with sufficient evidence that the proffered reason was really a pretext for intentional discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, (2000).

<u>*Mr. Gunter is a member of a protected class and is qualified to perform as an engineer.*</u>

Mr. Gunter, an African American engineer hired by Defendant—City of Omaha in 2013, received positive feedback from his supervisor, Mr. Hutzell, in his March 2018 review. (Filing No. 50, p. 1). Mr. Gunter consistently met performance standards without identified improvement areas and received no employment-related discipline or formal issues with job performance from 2018. (Exhibit 2, pp. 6-8).

<u>Mr. Gunter suffered an adverse employment action</u>.

In 2019, Defendants turned engineer Mr. Gunter into janitor at the Papillion Wastewater Treatment Plant, committing an adverse action.

An adverse action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge. *Wilkie v. Dep't of Health and Human Servs*., 638 F.3d 944, 955 (8th Cir. 2011).

Mr. Gunter has over 35 years of experience in boiler engineering, regulation, and safety. (Exhibit 3 - Gunter Aff. ¶2). He worked at Tyson Foods Inc. as a Boiler Technician in 2017, and at Immanuel Health Systems, a senior living community, where he maintained boilers and heating systems in individual units. His job at Immanuel Health required him to be at the top of his game in boiler management skills, as the aging clientele were more vulnerable to burn injury. Before working at Immanuel Health, Mr. Gunter was employed by Omaha Public Schools and Council Bluffs Community Schools, where he oversaw boiler maintenance to ensure a safe, productive, and learning-conducive environment for the district's children, teachers, staff, and administration. (Exhibit 3 - Gunter Aff. ¶2). Since 2013, Mr. Gunter worked as a Stationary Engineer in City of

Omaha buildings, operating boilers, adjusting and maintaining systems, and performing minor electrical maintenance. He also ordered commodities and maintained equipment. (Exhibit 2 p. 1).

On September 18, 2019, Mr. Gunter returned from FMLA and was assigned a "Work List" of 193 janitorial duties. (Gunter Depo. 95:19-25; Mahoney Depo. 20:23-21:1). These duties were required of him in place of his regular job responsibilities as a Stationary Engineer I. Mr. Gunter was required to perform a full eight-hour day of janitorial work daily, which he found discriminatory. Specifically, Mr. Gunter's newly charged responsibilities included *inter alia*: picking up trash, taking out the trash, scrubbing floors, mopping the floors, cleaning urinals, sweeping the floor, washing cars, cleaning cobwebs, cleaning raw sewage, cleaning up the outdoor grounds, scrubbing walls, scrubbing and disinfecting toilets, vacuuming, and cleaning car windows with Windex, without leaving any streaks. (Exhibit 7, pp. 1-6). Every day, Mr. Gunter was required to do a full eight-hour day of janitorial work based on the "Work List". (Sykora Depo. 75:10-76:9). Mr. Gunter found these duties discriminatory—as an Engineer, as he was not allowed to perform engineering duties or physically accommodating duties consistent with those assigned to 12 white employees injured from 2016 to 2019, such as watching traffic. (Gunter Depo. 119:20-120:2; 134:8-23). Mr. Gunter's engineer duties were not consistent with the janitorial duties on the "Work List." (Gunter Depo. 120:3-12). He had never performed any the janitorial duties and had never seen the list before being assigned as an official duty. (Gunter Depo. 120:3-16). The janitorial "Work List" did not include any job duties in the Mr. Gunter's job description or fall within the scope of engineering duties. (Gunter Depo. 124:25-125:18).

An adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities. *See Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 969 (8th Cir. 1999)*. Effectively transforming an engineer with 35 years of experience in boiler

operations into the 'Plant Janitor' serves as a significant tangible change in Mr. Gunter's job duties and/or working conditions which constitute a material employment disadvantage. *See Moisant v. Air Midwest, Inc.*, 291 F.3d 1028, 1031 (8th Cir. 2002). (A tangible change in duties or working conditions that constituted a material employment disadvantage can establish an adverse employment action).

*The circumstances give rise to an inference of discrimination.*

Mr. Gunter was treated differently than similarly situated persons who were injured at work and required modified duties. Here, on November 30, 2018, Mr. Gunter was injured at work. (Gunter Depo. 68:7-10). Mr. Gunter received medical treatment. First, Mr. Gunter received physical therapy then specialist treatment with Dr. Dubrow, an American Board-Certified Orthopedic Surgeon. (Gunter Depo. 71:19-22; Gunter Depo. 45:10-14; Dubrow Depo. 4:19-24). Dr. Dubrow  provided Mr. Gunter  with various workplace restrictions.

First, on January 29, 2019, Dr. Dubrow determined that Mr. Gunter could return to work if he followed movement restrictions to his left arm, to include no overhead reaching. (Exhibit 6 p. 4; Dubrow Depo. 14:17-25). Mr. Gunter was performing his regular engineering duties. . (Gunter Depo. 73:25-74:3).

Second, on April 30, 2019, Dr. Dubrow opined that Mr. Gunter may return to work on his same light duty restrictions (no overhead reaching with the left). (Exhibit 6, p. 5). Mr. Gunter was performing his regular engineering duties. (Gunter Depo. 73:25-74:3).

In March 2019, a flood occurred, causing temporary displacement of the plant. Gunter Depo. 75:16:18). All stationary engineers, including Mr. Gunter, were re-assigned to the South 24th Street office, performing HVAC work for City of Omaha buildings. Mr. Gunter was assigned to "ride-along" and straighten books on bookshelves. (Gunter Depo. 75:23:76-2; 76:3-25; 77:23-

78:2; Sykora Depo. 72:9-18).

On the day Mr. Gunter returned from FMLA—September 18, 2019, his supervisors, Defendants assigned Plaintiff a "Work List" of janitorial tasks. (Gunter Depo. 95:19-25; Mahoney Depo. 20:23-21:1). That list contained approximately 193 janitorial duties in place of Mr. Gunter's responsibilities as a Stationary Engineer I. (Exhibit 7). No white employee injured on the job at the Papillion Creek Wastewater Plant from 2016 to 2019, was ever assigned to perform the janitorial duties on the "Work List." (Exhibit 9, pp. 1-2, 5, 7-15 (Interrogatory 2, 3, 14)). For example, Mr. Eric Wright, a white employee was injured May 27, 2019; Mr. Chris Thomas, a white employee was injured on May 9, 2019; Mr. David Sykora, a white employee was injured on March 28, 2019; Mr. Robert Grzebielski, a white employee was injured on March 28, 2019; and Mr. Richard Mowery, a white employee who was injured on January 18, 2018. (Exhibit 9, pp. 1-2, 5, 7-15 (Interrogatory 2, 3, 14)). In fact, no other injured employee besides Mr. Gunter was assigned the janitorial duties on the "Work List." (Gunter 93:22-94:1).

In the *alternative* an adverse employment action was implicated when considering circumstances amounting to a constructive discharge. *Wilkie v. Dep't of Health and Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011).

Here, Plaintiff relies on the Constructive Discharge analysis, detailed i*nfra*, which outlines circumstances amounting to Mr. Gunter's constructive discharge. Mr. Gunter as outlined a prime prima facie case of discrimination under *McDonnell Douglas*.

**Plaintiff Addresses Defendants' Pretextual Arguments**

There are at least two ways in which Plaintiff an "demonstrate a 'material question of fact regarding pretext.'" *Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 748 (8th Cir. 2021) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045-46 (8th Cir. 2011) (en banc)).

First, Plaintiff can show that Defendants' "explanation is unworthy of credence . . . because it has no basis in fact," or "persuad[e] the court that a prohibited reason more likely motivated" (quoting *Torgerson*, 643 F.3d at 1047). Ultimately, to survive summary judgment Plaintiff "must point to enough admissible evidence to raise genuine doubt as to the legitimacy of [Defendants] motive." *Thompson v. Univ. of Ark. Bd. of Trs.*, 52 F.4th 1039, 1042 (8th Cir. 2022) (quoting *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014)).

***Pretext 1: Defendant's Factual Inconsistencies with the Creation and Assignment of the Janitorial "Work List."***

Mr. Gunter was on Family Medical Leave Act (FMLA) from June 23, 2019 to September 17, 2019. (Gunter Depo. 84:21-85:2). On his return, his supervisors assigned him a "Work List" of 193 distinct janitorial responsibilities (Gunter Depo. 95:19-25; Exhibits 7; 17).  Defendants assigned Mr. Gunter arduous janitorial work as accommodating "light duty." (Sykora Depo. 10:1-14; 91:23-92:9; Mahoney Depo 48:25-49-9; Hutzell Depo. 81:22-82:9). Mr. Gunter was required to do a full eight-hour day of janitorial work daily. (Sykora Depo. 75:10-76:9

Defendants stated that this janitorial "Work List" was created in 2016. (Sykora Depo. 34:24-35:8). Defendants stated the janitorial "Work List" contained nothing outside of Mr. Gunter's restrictions as prescribed by his physician. (Mahoney Depo. 21-9:11). Defendant—Mr. Mahoney—did not draft or modify the 2016 janitorial "Work List"; he just looked it over. (Mahoney Depo. 35:12-21). Mr. Sykora, without functional capacity testing experience, education or training, found that 193 janitorial jobs created two years before Mr. Gunter's injury accommodated his restrictions without adding or subtracting a single job duty. (Sykora Depo. 10:1-14; 91:23-92:9).

To accept Defendants' assertion that the janitorial list was created in 2016 with no subsequent modification of the list—would require the following conditionally predictions and probabilities to all align:

a) The "Work List" of 193 janitorial duties was created in 2016 (control variable).

b) Mr. Gunter would injure his left shoulder in 2018 (conditional probability #1).

c) Dr. Dubrow would provide restrictions that fit the 2016 janitorial work list to a T, since "Work List" was created prior. (conditional probability #2)

d) None of the 193 janitorial duties had to be removed or amended to account for Mr. Gunter's left shoulder injury (conditional probability #3-#193).

This explanation is simply unworthy of credence.

Next, the janitorial "Work List," a PDF document, contains a date stamp of September 11, 2019, seven days before Mr. Gunter returned to work on September 18, 2019. Mr. Sykora cannot explain how he edited the PDF file, and the "Work List" was created using Microsoft Word 2019, which did not exist in 2016. (Exhibit 8).

These incontrovertible facts make Defendants' argument that the janitorial "Work List" provided to Mr. Gunter, was created in 2016, less than credible.

Third, Mr. Sykora, derived these duties from a Labor Position. (Sykora Depo 34:2-17; 34:21-35:8; 77:22-24; 78:13-23; 79-4:11). The Labor Position, Mr. Sykora used to create the "Work List" is described as "physical at times heavy manual labor." (Exhibit 10 p. 1)

In comparison, the exertional requirements for the Labor Position are:

Ability to move objects weighing up to one hundred (100) pounds of force up to 33% of the time; to move objects up to fifty (50) pounds from 34% to 66% of the time... (Exhibit 10 p. 2)

The external requirements for Mr. Gunter's position as a Station Engineer I:

Ability to move objects weighing fifty (50) to one hundred (100) pounds of force up to 33% of the time; objects weighing twenty (20) pounds to fifty (50) pounds from 34% to 66% of the time... (Exhibit 2 p. 2)

The exertional requirements of a Labor position for which the janitorial "Work List" was derived requires greater exertional strength than Mr. Gunter's engineer position—yet his supervisors, who have no training, education or experience in functional capacity testing, assigned him this arduous work as accommodating "light duty." (Sykora Depo. 10:1-14; 91:23-92:9).

The fact that Defendants relied on a Laborer Position to supposedly accommodate restrictions for Mr. Gunter, even though that Laborer Position requires substantially greater exertional strength than is required by Mr. Gunter's engineer position, undercuts credibility.

Fourth, Mr. Sykora created a list of housekeeping duties in 2012 for operators and part-time employees. (Declaration of M. Peters, Exhibit B, Answers to Interrogatories). (Def. Br. 5). This undercuts the claim that the janitorial work list was created to accommodate Mr. Gunter's injury, as it was created for part-time employees without injury, not Mr. Gunter's specific injury.

This fact alone undercuts the assertion that the janitorial work list was created to accommodate Mr. Gunter's injury, as it was created for part-time employees with no injury, not to address a [Mr. Gunter's] specific injury.

Fifth, Defendant—Mr. Mahoney, *allegedly* advised Mr. Gunter that if any of the assigned work was too difficult, or if the trash was too heavy get someone to help. (Mahoney Depo. 23:24-

24:9, 30:18-31:4). This is inconsistent with Defendant—Mr. Mahoney's statement that this janitorial "Work List" contained nothing that wouldn't fully coincide with Mr. Gunter's prescribed restrictions. (Mahoney Depo. 21-9:11). Additionally, Mr. Gunter denies that Defendant—Mr. Mahoney ever said anything to him about seeking help if the work was too hard. (Gunter Depo. 96:3-16).

Sixth, Defendants state that the arduous janitorial work was given to Mr. Gunter so that he could have some work to do to get paid rather than stay at home on unpaid leave. (Mahoney Depo. 52:10-25; Sykora Depo. 104:6-105:17). Defendants never asked Mr. Gunter if he would rather be at home rather, then work as their janitor. (Exhibit, 17; Exhibit 3 - Gunter Aff. ¶8). Second, when Mr. Gunter returned to work from FMLA he requested to do his boiler duties— which is exactly what he did from the onset of his injury until the flood. (Exhibit 17 p. 1; Gunter Depo. 73:25-74:3; Exhibit 3 - Gunter Aff. ¶8 ). Defendants offered zero explanation of why that was not possible. (Exhibit 17, p. 1).

Ultimately, Mr. Gunter has "…offer[ed] sufficient evidence for a reasonable trier of fact to infer discrimination." *Vinh v. Express Scripts Servs. Co.*, 7 F.4th 720, 727 (8th Cir. 2021) (quoting *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998).

### Pretext #2 Defendants use the March 2019 Flood to Mask Discrimination

In March 2019, a flood occurred, causing temporary displacement of the plant. Gunter Depo. 75:16:18). All stationary engineers, including Mr. Gunter, were re-assigned to the South 24th Street office, performing HVAC work for City of Omaha buildings. Mr. Gunter was assigned to "ride-along" and straighten books on bookshelves. (Gunter Depo. 75:23:76-2; 76:3-25; 77:23-78:2; Sykora Depo. 72:9-18 )

Defendant—Mr. Hutzell stated that the Stationary Engineers were in "clean up mode"

secondary to the flood. (Hutzell Depo. 72:6-73:6). In actuality, Defendant—City of Omaha contracted a cleaning service to clean up the plant, there was no "clean up mode." (Gunter Depo. 73:1-9). In April 2019, the Papillion Creek Wastewater Treatment Plant was restored for primary treatment after the flood, and by May 2019, it was operational for secondary treatment. (Sykora Depo. 72:19-73:1). Stationary Engineers monitored the rebuilding process, ensuring proper functioning of air handlers for tunnel workers. (Sykora Depo. 101:13-102:10). From April 2019 to August 31, 2019, Mr. Sykora was unable to identify an employee assigned to janitorial tasks for clean-up after the flood, only identifying tasks undertaken by hired contractors. (Sykora Depo. 73:2-75:3; 101:24-102:10). No employee was assigned the janitorial "Work List" due to the March 2019 flood. (Exhibit 9, p 2. (Interrogatory 6)).

Additionally, this flood caused over $45 million worth of damage—the whole plant was inundated with water—a class 3 flood water. (Sykora Depo. 71:12-23). Mr. Gunter's supervisors' assertion that the City of Omaha deputized the Stationary Engineers in disaster clean up, by handing employees a mop and bucket—potentially exposing Defendants to unfettered tort liability, is simply uncredible.

### *Pretext 3: Defendants' Proffered Reasons to Mask Discrimination are Unsupported.*

Defendants argue that their comparators are not similar to Mr. Gunter. (Def. Br. 22). They claim that in 2018, white employees, Mr. Mowery and Mr. Jensen, were injured due to stricter restrictions than Mr. Gunter. However, this analysis fails as their specific restrictions did not negate their assignment to janitorial work, within *their* restrictions. In contrast to accommodate, Mr. Gunter he was assigned worked from a Labor Position, described as "physical at times heavy manual labor." (Exhibit 10, p. 1).

The janitorial "Work List" was not created during Mr. Mowery and Mr. Jensen's 2018

injuries. Defendants created it for assigning "light duty" to Mr. Gunter on September 11, 2019, using Microsoft Word 2019. (Exhibit 8).

Regarding the creation of the janitorial "Work List," Mr. Sykora stated he created it in approximately 2012 for operators or others to do and for part time employees. (Declaration of M. Peters, Exhibit B, Answers to Interrogatories). This fact **_alone_** undercuts the assertion that the janitorial "Work List" was created for injured [Mr. Gunter] employees. Specifically, Mr. Sykora stated assigning the janitorial "Work List" was something "previously for laborers, people of that nature, when the plant had work that needed to be done on the housekeeping, if we were short-staffed or something along those lines." (Sykora Depo. 34:7-12; 37:12-38:8).

Defendants argue that the plant situation was significantly different when Mr. Mowery and Mr. Jensen were injured, as the plan just a catastrophic flood in March 2019. This pretextual fact fails, as Defendants also identified similarly situated white employees who were injured during just after the March 2019 catastrophic flood. (Exhibit 9, pp. 1-2, 5, 7-15 (Interrogatory 2, 3, 14)). For example: 1) Mr. Eric Wright, injured May 27, 2019, 2) Mr. Chris Thomas, injured on May 9, 2019, 3) Mr. David Sykora, injured on March 28, 2019, 4) Mr. Robert Grzebielski, injured on March 28, 2019 ((Exhibit 9, pp. 1-2, 5, 7-15 (Interrogatory 2, 3, 14)). None of these employees were assigned janitorial duties to accommodate their injuries because of the flood in spite of the plant being in "clean up mode." (Hutzell Depo. 72:6-73:6).

Additionally, from March 2019 to May 2019, Stationary Engineers returned to the plant to monitor tasks at the facility for the rebuilding process to make sure that all the air handlers were functioning properly for people doing work down the tunnels. (Sykora Depo. 101:13-102:10). The Defendants' pretextual fact, that the flood prevented injured workers from being used as janitors is simply unsupported.

Fourth, in pretext, Defendants alleged that the janitorial duties assigned to Mr. Gunter in September 2019 were the duties that were available at the time and those that fit within Mr. Gunter's restrictions. (Def. Br. 9). However, when Mr. Gunter returned to work from FMLA he asked Defendants to do his boiler duties which is exactly what he did from the time, he was originally injured in November 2018. (Exhibit 17; Gunter Depo 73:25-74:3; Exhibit 3 - Gunter Aff. ¶8). Defendants offered no explanation of why. (Exhibit 17).

Lastly, Defendants' state the watching traffic assignment, provided to Mr. Mowery and Mr. Jensen, did not exist in 2019, because the composting facility was not operating due to the flood. (Def. Br. 22). Again, that is unsupported as by May 2019 employees were assisting contractors that were onsite in that rebuilding process and the plant was back up and running for secondary treatment. (Sykora Depo. 72:19-73:5; 74:10-18). Contractors were coming in because the street was never closed down. (Gunter Depo. 132:12-133:13). Unless Defendants are asserting that *only* composting contractors have a propensity to drag race, then this simply without merit.

When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, Defendants' ability to predict that a 2016 janitorial work, created from a manual labor position would accommodate Mr. Gunter's 2019 restrictions, without revisions, would leave a reasonable jury to believe that Defendants' reasons are pretextual. An issue of material fact exists.

## 2. <u>RETALIATION: FMLA</u>
   **First Cause of Action**

The FMLA entitles an eligible employee to twelve weeks of leave during a twelve-month period if she has "a serious health condition that makes [him] unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "An employee can bring three types of FMLA claims against her employer: interference, retaliation, and discrimination." *Corkrean v. Drake Univ.*, 55 F.4th 623, 630 (8th Cir. 2022).

An FMLA retaliation claim is one "where the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Brandt v. City of Cedar Falls*, 37 F.4th 470, 478 (8th Cir. 2022). (quoting *Wierman*, 638 F.3d at 999). FMLA retaliation is evaluated under the *McDonnell-Douglas* burden-shifting framework, *see Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011), and [Plaintiff] retains the ultimate burden of "demonstrat[ing] that [Defendant's] proffered reason is pretextual." *Corkrean*, 55 F.4th at 631 (quoting *Mitchell v. Iowa Prot. & Advoc. Servs., Inc.*, 325 F.3d 1011, 1013 (8th Cir. 2003)).

Mr. Gunter returned to work following Family Medical Leave Act (FMLA) for a qualifying reason from on September 18, 2019. (Gunter Depo. 84:21-85:2). It is undisputed fact that on the very first day of Mr. Gunter's return to work following FMLA, Mr. Gunter's supervisors effectively turned him into a janitor by assigning him 193 distinct janitorial duties to perform, provided to Mr. Gunter as "Work List." (Gunter Depo. 95:19-25; Mahoney Deposition 20:23-21:1). The janitorial "Work List" contained approximately 193 cleaning duties, as described *supra* that Mr. Gunter's supervisors required him to perform in lieu of his regular responsibilities as a Stationary Engineer I. (Exhibit 7).

Mr. Gunter found the newly assigned duties discriminatory and degrading, as he was not allowed to perform any engineering duties in his job description as a Stationary Engineer I or perform any physically accommodating duties consistent with those assigned to the 12 white

employees who were injured from 2016 to 2019. (Gunter Depo. 119:20-120:2; 119:15:18; 122:23-123:1; 131:8-16). Mr. Gunter also found that none of the janitorial duties on the "Work List" were consistent with his engineer duties, as he has never done any of these duties since commencing employment as an engineer with the City of Omaha in 2013. (Gunter Depo. 120:3-12). None of the job duties described in the janitorial "Work List" were listed in Mr. Gunter's job description, nor do these duties fall within the scope of an engineering duties. (Gunter Depo. 124:25-125:18). Temporal proximity exists, as the day of Mr. Gunter's return from FMLA, he was reassigned to be the plant's janitor. (Gunter Depo. 95:19-25; Mahoney Deposition 20:23-21:1). Additionally, on August 28, 2019, Defendant—City of Omaha Human Resource Department, employee Ms. Mandy Garrod and Mr. Sykora discussed termination as an option for Mr. Gunter, so long as they (Defendants) followed the process for accommodation (Exhibit 19). Retaliatory termination was on the horizon.

Turning an engineer with 35 years of experience in, in boiler operations, to the 'Plant Janitor,' serves as a significant tangible change in Plaintiff's job duties or working conditions which constitute a material employment disadvantage. *See Moisant v. Air Midwest, Inc.*, 291 F.3d 1028, 1031 (8th Cir. 2002). (A tangible change in duties or working conditions that constituted a material employment disadvantage can establish an adverse employment action).

In the *alternative* an adverse employment action was implicated when considering circumstances amounting to a constructive discharge. *Wilkie v. Dep't of Health and Human Servs.*, 638 F.3d 944, 955 (8th Cir. 2011).

Here, Plaintiff relies on the Constructive Discharge analysis, detailed i*nfra*, which outlines circumstances amounting to Mr. Gunter's constructive discharge. Mr. Gunter as outlined a prime

prima facie case under the *McDonnell-Douglas* burden-shifting framework, *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011)

**Defendants' Pretextual Arguments**

***Pretext 1: Defendant's Factual Inconsistencies with the Creation and Assignment of the Janitorial "Work List."***

First, as outlined, in the Discrimination analysis, *spura*, Defendants' assertion that the janitorial work list was created in 2016 is not credible. The janitorial "Work List," a PDF document, contains a date stamp of September 11, 2019, seven days before Mr. Gunter returned to work on September 18, 2019. Mr. Sykora cannot explain how he edited the PDF file, and the "Work List" was created using Microsoft Word 2019, which did not exist in 2016. (Exhibit 8).

Second, as outlined, in the Discrimination analysis, *spura*, Defendants' assertion that the janitorial Work List accommodated Mr. Gunter's restrictions is undercut by the following facts:

1. The specific duties listed on the janitorial "Work List" were generated from a Laborer Position that is described as "physical at times heavy manual labor." (Exhibit 10 p. 1; Sykora Depo. 34:2-17; 34:21-35:8; 77:22-24; 78:13-23; 79-4:11).

2. Mr. Sykora stated he initially created the janitorial "Work List" in approximately 2012, and that it was intended for individuals hired as operators and was not developed for workers injured on the job. (Declaration of M. Peters, Exhibit B, Answers to Interrogatories). (Defendant's Exhibit 12, p. 1).

3. The janitorial "Work List" was never modified (Sykora Depo. 91:23-92:9). Defendants had no way to correctly predict the nature, extent, and severity of Mr. Gunter's injury when the "Work List" was created in 2016.

***Pretext #2 Defendants use the March 2019 Flood to Mask Discrimination***

As outlined, in the Discrimination analysis, *spura*, Defendants' assertion that the janitorial "Work List" was predicated by the March 2019 flood undercut by the following facts:

1. The flood occurred March 2019, Plaintiff was assigned the janitorial work list on September 18, 2019. (Gunter Depo. 75:16:18; Exhibit 8).

2. Defendants contracted a cleaning service to clean up the plant. (Gunter Depo. 73:1-9).

3. No employee was assigned the janitorial "Work List" due to the March 2019 flood. (Exhibit 9, p. 2, Interrogatory 6.)

Plaintiff has shown Defendants "did not truly believe" they were accommodating Plaintiff or providing him work that fell within his restrictions. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (2012). Issues of material fact exits.

### 3. RETALIATION: Title VII, NFEPA, §1981
Causes of Action 2-4

"Title VII prohibits employers from retaliating against an employee who is engaged in a protected activity, which can be either opposing an act of discrimination made unlawful by Title VII. . . or participating in an investigation under Title VII...." *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (citations omitted).

Claims of discrimination Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer "…to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Claims of retaliation brought under 42 U.S.C. § 1981 are analyzed in the same manner as retaliation claims brought under Title VII. *Al-Zubaidy v. TEK Industries, Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005).

The plaintiff establishes a prima facie case by showing that: (1) he engaged in protected

conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct. *Arraleh, 461 F.3d at 977.*

Protected activity includes opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII. *Hunt v. Nebraska Public Power Dist*., 282 F.3d 1021, 1028 (8th Cir. 2002). A plaintiff need not establish the conduct that what she opposed was, in fact, discriminatory but rather must demonstrate good faith and reasonable belief that the underlying challenged conduct violated the law. *Buettner v. Arch Coal Sales Co., Inc*., 216 F.3d 707, 714 (8th Cir. 2000). The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id*

On October 10th and 11th, 2018, Mr. Gunter filed complaints of harassment and discrimination. He claimed that a white co-worker intentionally broke his locker lock. He reported the incident to three individuals: Plant Manager David Sykora, City of Omaha Human Resources Director Tim Young, and Union President Tony Burkhalter. (Exhibit  3 - Gunter Aff. ¶4; Sykora Depo. 18:1-13).

Local 251 investigated under *Article 24 Non-Discrimination Section 4:* (Exhibit 5 p. 1)Mr. Tim Young took over the complaint on January 9, 2019, but Mr. Gunter did not receive any notification or disposition of his discrimination and harassment claim. (Sykora Depo. 21:12-23:17; Exhibit  3 - Gunter Aff. ¶6).  On January 17, 2019, Mr. Young called Gunter's allegations frivolous. (Exhibit 5, p. 3).

While the investigation was ongoing, in November 2018, Mr. Gunter, completed Open Benefits enrollment. In November 2018, Mr. Gunter completed Open Benefits enrollment for $20,000 in Voluntary Spousal Life Insurance for his wife, Ms. Carol Gunter. (Exhibit 3 - Gunter Aff. ¶10). The insurance was approved for $20,000 and effective on January 1, 2019. (Gunter Depo. 110:14-24; Gunter Aff. ¶10; Exhibit 18, pp. 1-2), Mr. Gunter received an enrollment confirmation from the City of Omaha with $11.00 of earnings as consideration. (Exhibit 18, p. 3). From January 27, 2019, $11.00 was deducted from Mr. Gunter's paycheck in consideration of the insurance. (Exhibit 18, p. 4). He was never explicitly informed that he had to fill out EOI to obtain the insurance. (Exhibit 3 -Gunter Aff. ¶10).

On February 4, 2019, the City of Omaha provided Mr. Gunter with oral and written confirmation of his $20,000 Voluntary Life Insurance. (Exhibit 18, pp. 5-6, 8). On February 9, 2019, Mr. Gunter wife passed away. Mr. Gunter attempted to collect under his policy by submitting his wife's death certificate. Mr. Gunter was told he had no life insurance. Considering the City of Omaha's error, Minnesota Life/Securian agreed to pay out Mr. Gunter's claim, only if the City of Omaha would reimburse them. (Exhibit 18, p. 10). Mr. Tim Young, decided not to not pay Mr. Gunter's claim, earlier describing Mr. Gunter as a "problematic" employee. (Exhibit 18 pp. 8, 11-12). Mr. Gunter's $20,000 Voluntary Life Insurance Claim was denied. (Exhibit 18, pp. 11-12)

To establish a causal link ..., the employee must prove that an employer's retaliatory motive played a part in the adverse employment action." *Hite v. Vermeer Mfg. Co.,* 446 F.3d 858, 865 (8th Cir. 2006) (quotations omitted). "[E]vidence that gives rise to 'an inference of retaliatory motive' on the part of the employer is sufficient to establish a causal link." *Kipp v. Mo. Highway & Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir.2002) (quoting *Rath v. Selection Research, Inc.,* 978 F.2d 1087, 1090 (8th Cir.1992))   A causal link exists, as Mr. Young chose not to pay out Mr. Gunter's

Voluntary Life Insurance claim after taking over investigative duties and describing the him as a "problematic employee" less than two months after taking over.

An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Defendant—City of Omaha's Human Resource Director, Mr. Young's denial of Mr. Gunter's $20,000 Voluntary Life Insurance claim, would dissuade a reasonable worker from making a charge of discrimination.

Moving to the retaliatory janitorial work list, first, Mr. Gunter's complaint of discrimination took place on October 10-11, 2018. (Exhibit 3 - Gunter Aff. ¶6). The Union Local 251 investigated under *Article 24 Non-Discrimination Section 4.* (Exhibit 5, p. 1). On January 9, 2019, Omaha Human Resources Director, Mr. Tim Young, took over investigative duties for Mr. Gunter's October 2018 complaint. (Sykora Depo. 21:12-23:17). On January 17, 2019, Mr. Young called Mr. Gunter's allegations "frivolous". (Exhibit 5, p. 3). Mr. Gunter received no notification of the undertaking or the disposition of his discrimination and harassment claim from Mr. Young. (Exhibit 3 - Gunter Aff. ¶6). The day Mr. Gunter returned from FMLA—September 18, 2019, his supervisors, assigned Mr. Gunter a "Work List" of 193 distinct janitorial tasks, as described *supra*. (Gunter Depo. 95:19-25; Mahoney Depo. 20:23-21:1). Mr. Gunter found these newly assigned duties discriminatory and degrading. (Gunter Depo. 119:15:18; 122:23-123:1;131:8-16).

*In Burlington,* the Supreme Court found "retaliatory discrimination where both the former

and both the former and present duties fall under the same job description. Almost every job category involves some duties that are less desirable than others. That is presumably why the EEOC has consistently recognized retaliatorily work assignments as forbidden retaliation." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). Here, the janitorial "Work List" was completely outside Mr. Gunter's job description. None of janitorial duties were consistent with Mr. Gunter's engineer duties. (Gunter Depo. 120:3-12).

Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 71, (2006). Mr. Gunter found these newly assigned duties discriminatory and degrading, as he was effectively transformed by his supervisors, and against his will, into the plant janitor. (Gunter Depo. 119:15:18; 122:23-123:1;131:8-16). The assignment of the janitorial work list, in September 2019 occurred less than 10 months from the City of Omaha's takeover of Mr. Gunter's discrimination and harassment investigation, in January 2019. Mr. Gunter received no notification of the undertaking or the disposition of his discrimination and harassment claim from Mr. Young. (Exhibit 3 - Gunter Aff. ¶6).

Plaintiff notes, Defendants' pretextual arguments addressed under FMLA—Retaliation, *supra*, which apply to Plaintiff's Title VII—Retaliation claim. Mr. Gunter has adduced sufficient evidence disputing Defendant's pretextual reasons for assigning Mr. Gunter the janitorial work list, under Title VII—Retaliation claim. This discriminatory janitorial work list denotes a retaliatory animus toward Mr. Gunter, an issue of material fact exists.

Next in the alternative, "Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation." *Fercello v. Cty. of Ramsey*,

612 F.3d 1069, 1083 (8th Cir. 2010) (quoting *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995). Here, Plaintiff relies on the Constructive Discharge analysis, detailed *infra*, which outlines circumstances amounting to Mr. Gunter's constructive discharge. Mr. Gunter as outlined a prime prima facie case of retaliation by showing that he engaged in protected conduct by either opposing an act of discrimination, he suffered an adverse employment action; and the adverse action was causally linked to the protected conduct.

4. **CONSTRUCTIVE DISCHARGE: Title VII, NFEPA, §1981**
   **Causes of Action 5-7**

Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit. *Brenneman v. Famous Dave's of America, Inc.*, 507 F.3d 1139, 1144 (8th Cir. 2007). To prove constructive discharge, a plaintiff must demonstrate that: (1) a reasonable person in her situation would find the working conditions intolerable and (2) the employer intended to force the employee to quit. *Id.* If the plaintiff cannot show that the employer intended to force her to quit, she can still prevail if the employer could have reasonably foreseen that the employee would quit as a result of its actions. *Brenneman,* 507 F.3d at 1144. A reasonable employee has an obligation not to assume the worst and not to jump to conclusions too quickly. *Id.* An employee who quits without giving her employer a reasonable chance to work out a problem has not been constructively discharged. *Id*.

*The arduous janitorial "Work List" assigned to Mr. Gunter rendered his working conditions intolerable.*

Mr. Gunter's boast over 35 years of extensive, experience, education and training in boiler operations, as outline, *supra.* When Mr. Gunter returned from FMLA, his supervisors reassigned him a "Work List" of 193 distinct janitorial duties, as described *supra* (Exhibits 7; 17)

Mr. Gunter found these newly assigned duties discriminatory and very degrading. (Gunter Depo. 36:1-10; 119:15:18; 122:23-123:1;131:8-16). Mr. Gunter found it derogatory—the scrubbing bathroom walls, emptying trash cans, washing car windows—with the specific directive not to leave streaks. The specific detail on how his supervisors wanted Mr. Gutner to be their janitor, was very degrading. (Gunter Depo. 92-2:11). Further, Mr. Gunter described the janitorial "Work List" as duties that nobody was required to do—and given the exceptional size of the plant, none of the janitorial tasks was ever done by one person, since Mr. Gunter commenced worked in 2013. (Gunter Depo. 92:18-93:14). Mr. Gunter described the janitorial "Work List" as not being a job for him—as a person on light duty—or when it compares to his engineering duties. (Gunter Depo. 130-13:24). Mr. Gunter found the arduous janitor "Work List" degrading, discriminatory and difficult. (Gunter Depo. 131:8-16). Mr. Gunter specifically highlighted a "disgusting area," called a sludge load out room here he was required to clean, and when doing so his supervisor, Mr. Hutzell—would peek around the corners to check on him, without announcing his presence. (Gunter Depo. 53:10-54:7; 96:13-23).

The Eight Circuit Court of Appeals stated:

> We have previously recognized a plaintiff may support a constructive discharge claim with evidence that she was reassigned to a new position which "a reasonable employee in [her] position would find demeaning and intolerable." Here, a reasonable jury could conclude the change in position from finance coordinator to food services assistant was a demotion with a diminution in title and significantly decreased responsibilities, and that a reasonable employee in Sanders's position would find the reassignment demeaning.

*Sanders v. Lee Cty. Sch. Dist. No. 1*, 669 F.3d 888, 894 (8th Cir. 2012)

It is objectively reasonable to believe—that requiring an engineer with 35 years of experience in boiler maintenance safety and operation to be a laborious janitor, with his supervisors watching in delight, would render Mr. Gunter's working conditions intolerable.

From September 18, 2019, Mr. Gunter was never allowed to return to his occupation as an engineer and was forced, instead, to continue doing physically arduous janitorial work. (Exhibit 3 - Gunter Aff. ¶7). Mr. Gunter turned to Local 251 union representative Tony Burkhalter—he advised Mr. Gunter not to accept a reasonable accommodation but to go to his treating doctor, Dr. Dubrow, for a professional medical evaluation/opinion on Mr. Gunter could perform his engineering job. (Exhibit 3 - Gunter Aff. ¶7; (Gunter Depo. 50:6-51:4). Mr. Burkhalter's stated that Mr. Gunter accepting a reasonable accommodation would allow the City of Omaha to fire him without legal consequence if they could not accommodate him. (Gunter Depo. 51:16-52:24) However, the Union Local 251's attorney stated that a reasonable accommodation is not necessary if Mr. Gunter can fully perform his engineering job as described in his job description. (Gunter Depo. 51:16-52:24). Foreboding, in the background, Plant Manager—Mr. Sykora was advised by Defendant—City of Omaha's HR department, that termination is an option for Mr. Gunter after following the process for accommodation. (Exhibit 19).

a) _Refusing to allow Mr. Gunter to return to his engineering duties._

On October 23, 2019, the City of Omaha's Labor Relations Director, Mr. David Grauman, sent Mr. Gunter a certified letter stating that Dr. Dubrow's restrictions prevented Mr. Gunter from performing essential functions of his engineer position. The City of Omaha left Mr. Gunter with two options: apply for retirement (disability) or resign. If Mr. Gunter failed to exercise these options by November 15, 2019, the City of Omaha would proceed with separation of employment. (Exhibit 14 pp. 1-2).On October 29, 2019, Mr. Gunter returned to Dr. Dubrow to provide an expert opinion on his ability to perform his duties as a Stationary Engineer I. Dr. Dubrow examined Mr.

Gunter and in his professional opinion, lifted Mr. Gunter's restrictions, but the City of Omaha ignored it. (Gunter Depo. 87:6-20; 88:8-18; Exhibit 6, p. 12; Dubrow Depo. 35:1-20; Exhibit 3 - Gunter Aff. ¶8).

On October 30, 2019, Mr. Zach Wagner, City of Omaha Human Resource Technician, was informed by Dr. Dubrow's nurse, Ms. Reineke-Wulf that Mr. Gunter was seen by Dr. Dubrow and that the restrictions were lifted, and a full duty work was provided. (Exhibit 15, p. 1). Ms. Reineke-Wulf further noted a full duty note was appropriate and that Mr. Gunter could return to his normal workload. On November 7, 2019, Ms. Reineke-Wulf informed Mr. Wagner that Dr. Dubrow had said that Mr. Gunter could perform all of his job duties and that all restrictions were discontinued. (Exhibit 14). When Mr. Gunter again asked his supervisors to return to his job as an engineer, the City of Omaha ignored his request and continued to force Mr. Gunter to, instead, to do arduous labor of a janitor as laid out in the "Work List". (Exhibit 16, pp. 3).

The City of Omaha did not accept Dr. Dubrow's expert opinion, so they scheduled a "Fit-for-Duty" exam for Mr. Gunter four days after the City of Omaha would proceed with separation of employment, as outlined in the October 23, 2019, letter. (Exhibit 16, p. 2). Mr. Gunter felt cornered and resigned, as the exam was scheduled after the separation. Failure to retire or resign by November 15, 2019, would result in termination, thus forfeiting his $24,000 pension. (Exhibit 3 - Gunter Aff. ¶9) Resignation allowed him to cash out his pension without withholding or forfeiture. On November 14, 2019, Mr. Gutner resigned. (Exhibit 3 - Gunter Aff. ¶9; Gunter Depo. 52: 2-13). *See Henderson v. Simmons Foods, Inc*., 217 F.3d 612, 617 (8th Cir. 2000). (The employer can render working conditions intolerable through inaction as well as action.)

b) *Misclassifying Mr. Gunter's engineering position to force his resignation*.

On October 23, 2019, the City of Omaha's labor relations director sent Mr. Gunter a certified letter stating that Dr. Dubrow's August 8, 2019, restrictions prevent him from performing essential functions of his engineer position. (Exhibit 14, p. 1). The stationary engineer position requires "substantial upper body strength", "frequent lifting," and "moving objects weighing up to 100 pounds." (Exhibit 14, p. 1). However, Dr. Dubrow's restrictions do not mention Mr. Gunter's inability to "frequently lift", "move objects up to 100 pounds", or lack "substantial upper body strength." (Exhibit 6 pp. 7-8). The requirement of "substantial upper body strength" is not listed in the Stationary Engineer classification, nor is the inability to "move objects." (Sykora Depo. 88:24-89:2; 89:9-12; Exhibit 2, p. 2. ). When Mr. Sykora, the Plant Manager, received the letter, he did nothing about it. (Sykora Depo. 86:17:20; 89:22-90-3).

### c) *Defendant—City of Omaha  schedules a 'fit for duty' examination on November 19, 2019 to force Mr. Gunter out.*

Defendants did not accept Dr. Dubrow's expert opinion, so they scheduled a "Fit-for-Duty" exam for Mr. Gunter four days after they would proceed with separation of employment, as outlined in the October 23, 2019, letter. (Exhibit 16, p. 2). Mr.  Gunter felt cornered and resigned, as the exam was scheduled after separation. Failure to retire or resign by November 15, 2019, would result in termination, thus forfeiting his $24,000 pension. (Exhibit 3 - Gunter Aff. ¶9) Resignation allowed him to cash out his pension without withholding or forfeiture. On November 14, 2019, Mr. Gutner resigned. (Exhibit 3 - Gunter Aff. ¶9; Gunter Depo. 52: 2-13; 104:13-18; 105:7-20).  Defendant—City of Omaha was calculated, in scheduling a 'Fit-for-Duty" exam after the date where Mr. Gunter would be separated from employment, thus he was constructively discharged.

Defendants' brief belies the same pretextual discriminatory facts, was discussed, *supra.* Second,  Defendants brief also fails to mention, that City of Omaha—Labor Relations Director

sent Mr. Gunter a certified letter, with a November 15, 2019, date to effectively "resign" or "retire via disability" and failure to do so, would result in separation of employment. (Exhibit 14).

Defendants' plan to trick Mr. Gunter to apply for a reasonable accommodation so they could justifiably fire him, did not work—they reclassified the exertional requirement of the Stationary Engineer I  job to create a conflict with Dr. Dubrow's restrictions. Then Defendants' ignored Dr. Dubrow's expert opinion lifting Mr. Gunter's restrictions—three times, including twice by his Dr. Dubrow's nurse, then Defendants' scheduled a "Fit for Duty" exam after requiring Mr. Gunter to resign or retire via disability, or face separation of employment.  Defendant's reasons for discrimination, are simply without credence. Mr. Gunter was constructively discharged.

## 5. <u>EQUAL PROTECTION 42 U.S.C. § 1983</u>
### Eleventh Cause of Action

To establish liability under this unofficial custom theory, Plaintiff must demonstrate: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policy-making officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation. *Snider v. City of Cape Girardeau,* 752 F.3d 1149, 1160 (8th Cir. 2014).

Here, Defendants' supervisors and Plant Manager, Mr. Sykora assigned Mr. Gunter arduous janitorial work in place of his engineering job (Sykora Depo. 10:1-14; 91:23-92:9). Mr. Defendant—City of Omaha's Human Resource Department also determined that "Work List" of 193 janitorial duties fit, Mr. Gunter's 2019 restrictions. (Sykora Depo 80:23-81:4).

Here,  on October 29, 2019, Dr. Dubrow examined Mr. Gunter, and in his professional opinion, he lifted Mr. Gunter's restrictions. (Dubrow Depo. 35:1-20). Mr. Gunter provided the

Defendants a full duty work release form Dr. Dubrow (Exhibit 6, p 12). When the City of Omaha received Dr. Dubrow's medical note lifting Mr. Gunter's restrictions—they ignored it. (Exhibit 3 - Gunter Aff. ¶8). Defendants continued to require Mr. Gunter to do janitorial work. Second on, October 30, 2019, Mr. Zach Wagner, City of Omaha Human Resource Technician called Dr. Dubrow's nurse—Ms. Lavonne Reineke-Wulf, RN, to confirm that a release was provided. Ms. Reineke-Wulf, RN, informed Defendants a full duty work was provided. (Exhibit 15, p. 1). Defendants continued to require Mr. Gunter to do janitorial work. On October 30, 2019, Mr. Zach Wagner, City of Omaha Human Resource provided Dr. Dubrow's nurse—Ms. Lavonne Reineke-Wulf, RN with Mr. Gunter's Stationary Engineering job description to determine if it was Dr. Dubrow's opinion that Mr. Gunter could do his Stationary Engineering position (Exhibit 15). On November 7, 2019, Ms. Reineke-Wulf, RN emailed Mr. Wagner and informed him that she had spoken with Dr. Dubrow, and that Dr. Dubrow opined that Mr. Gunter could perform all of the duties of his job, and that all restrictions heretofore in place were discontinued. (Exhibit 15, p. 2). When Mr. Gunter again asked his supervisors to return to his job as an engineer, the City of Omaha ignored his request and continued to force Mr. Gunter to, instead, do the physically arduous labor of a janitor as laid out in the "Work List". (Exhibit 16, pp. 3).

Without question, Plant Manger Mr. Sykora with the blessings Defendant—City of Omaha's Human Resources Department, assigned Mr. Gunter "physical at time heavy manual labor" as light duty. (Sykora Depo 34:2-17; 34:21-35:8; 77:22-24; 78:13-23; 79-4:11; Exhibit 10 p. 1). Defendant—City of Omaha, under the direction of Labor Relations Director David Grauman was able to re-classify Mr. Gunter's Stationary Engineer position making it require "substantial upper body strength", "frequent lifting", and "moving objects weighting up to 100 pounds" to create a conflict with Dr. Dubrow's August 8, 2019, restrictions. (Exhibit 14 p. 1; Exhibit 2).

Instead of allowing Mr. Gunter's return to his engineering duties, after the Defendant—City of Omaha's Human Resources received three responses from Dr. Dubrow, lifting the Mr. Gunter's restrictions, they continued to require him to do laborious demeaning janitorial work. As such, Mr. Gunter suffered harm. A genuine issue of triable facts exits.

## 6. Breach of Contract/Duress
### State Law Claims: Cause of Action 12-13

Mr. Gunter signed the Settlement Agreement with the City under duress during the most vulnerable circumstances and financial stress that Mr. Gunter was under. "Duress is coercion that is wrongful as a matter of law." *City of Scottsbluff v. Waste Connections*, 282 Neb. 848, 867 (Neb. 2011). "Lawful coercion becomes impermissible when employed to support a bad-faith demand: one that the party asserting it knows (or should know) to be unjustified." Coercion does not include hard bargaining, but it can include circumstances in which the stronger party exploits the other's vulnerability in a manner that passes the bounds of economic self-interest.

In this case, it is undoubtedly that the Defendant—City of Omaha s the stronger party here. As Mr. Gunter was still mourning the death of his wife, funeral home and other bill collectors were relentless trying to collect money from Mr. Gunter. The City used that unfortunate opportunity to force Mr. Gunter to sign a release whereby the only City paid 1/3 of what Mr. Gunter is entitled. Mr. Gunter did not have an attorney, as not advised to bring an attorney and Tim Young is an attorney (Gunter Depo. 114:7-12). The City could have encouraged Mr. Gunter to have independent counsel to review the release, especially when City is the stronger party in the transaction. Essentially, the City exploited Plaintiff's economic and emotional vulnerabilities in a manner that passes the bounds of economic self-interest at a time when Mr. Gunter could not possibly help himself, as he had no choice, he was still grieving his wife and made loans with the bank and funeral home. Mr. Young was aware of that Mr. Gunter was told that he indeed had

Voluntary Life insurance—yet he agreed to deny the claim. The City acted in bad faith. It was unjustified. Plaintiff, therefore, signed the release under duress and Defendants' motion should be denied.

**<u>Rescission</u>**

Rescission, in contrast, may be granted where the parties have apparently entered into a contract evidenced by a writing, but owing to a mistake, their minds did not meet as to all the essential elements of the transaction, so that no real contract was made by them. Generally, grounds for cancellation or rescission of a contract include fraud, duress, unilateral or mutual mistake, and inadequacy of consideration. *Turbines Ltd. v. Transupport, Inc.*, 285 Neb. 129, 825 N.W.2d 767 (2013). *Hardy v. Wiggins (In re of Wiggins)*, 314 Neb. 565, 572 n.18 (2023). The remedies of rescission and damages are inconsistent; the former proceeding upon disaffirmance, and the latter upon affirmance of the contract. ... Rescission extinguishes the contract and neither party can thereafter base any right of recovery on any part of it." James v. Hogan, 154 Neb. 306, 47 N.W.2d 847. Where rescission is granted both parties must, as nearly as possible, be restored to the status quo. 17A C.J.S. Contracts §§ 438, 439, p. 545. See, also, 17A C.J.S. Contracts § 440, p. 551.

Here, the Settlement and Release agreement, lacks consideration. The City of Omaha had an obligation to pay, the $20,000 therefore, Mr. Gunter did NOT provide any consideration for the City of Omaha, "Settlement and Release" therefore the Settlement and Release must be cancelled.

**Good Faith and Fair Dealing**

The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract. *Ne. Neb. Pub. Power Dist.*, 300 Neb. 237, 912 N.W.2d 884

(2018). The nature and extent of an implied covenant of good faith and fair dealing are measured in a particular contract by the justifiable expectations of the parties. *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014). Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party. *Id*. The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. *Id*. *Homebuyers Inc. v. Watkins*, No. A-18-258, 2019 Neb. App. LEXIS 161, at *24 (Ct. App. June 4, 2019).

Whether it is through a third party or not, it is undisputable that the City agreed to provide Mr. Gunter with a life insurance policy for $11.00 per paycheck. As to who the City assigned that contract to is not significant to Mr. Gunter so long that Mr. Gunter received the benefits of the life insurance policy. The City's online portal or the City's failure to inform Mr. Gunter of any additional steps that Mr. Gunter ought to take to finalize the policy is unreasonably and certainly exceeds Mr. Gunter's justifiable expectations. The very purposes and express terms of the contract between the City and Mr. Gunter is provide him with a life insurance policy for his wife. Mr. Gunter did everything that was required of him. He went to the City's online portal and completed the application and paid the $11.00 premium per paycheck that required of him. (Exhibit 18). The City injured Plaintiff's right to receive the benefits of the contract by not informing Plaintiff that either the online portal was not working properly or that there was an additional form called Evidence of Insurability (EOI) to complete and submit. The City cannot have it both ways. Therefore, the Defendants' motion should be denied.

**Promissory Estoppel**

The doctrine of promissory estoppel is based on the proposition that a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or

a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. *Folgers Architects v. Kerns*, 9 Neb. App. 406, 612 N.W.2d 539 (2000), *reversed in part on other grounds* 262 Neb. 530, 633 N.W.2d 114 (2001). See, *also, Goff-Hamel v. Obstetricians Gyns., P.C.*, 256 Neb. 19, 588 N.W.2d 798 (1999). Promissory estoppel requires that reliance be reasonable and foreseeable. *Blinn v. Beatrice Commu*, 13 Neb. App. 459, 471 (Neb. Ct. App. 2005).

Here, Mr. Gunter reasonably believed that he had coverage when a) he received confirmation from the City's portal that he did sign up for the insurance policy; and b) $11.00 a month was being taken out of his paycheck to pay for the policy (Exhibit 18). The City should not be allowed to conveniently escape liability by paying about 1/3 of the insurance policy and forced Mr. Gunter to sign a release at a time when Mr. Gunter was mourning the death of his wife. Mr. Gunter reasonably and foreseeably relied on the City's portal and promise. (Exhibit 18). Therefore, the City should be held liable for the $20,000 Mr. Gunter should have received under the insurance policy had it not been for the City's failure to inform Plaintiff of any discrepancy in its online portal and/or the need for Mr. Gunter to complete the EOI form. Exhibit 3 - Gunter Aff. ¶10.

## CONCLUSION

For all the reasons set forth herein, Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 must be **DENIED** in its entirety:

Dated this 1st of August 2023

`

PLAINTIFF RILEY T. GUNTER

By: s/ Potso Mahlangeni-Byndon
Bar Number: 43031
Attorney for Plaintiff
2016 Fowler Avenue
Omaha, Nebraska 68110
(402) 570-1287
potso@byndonlaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d)(3), I hereby certify this brief complies with the requirements of NECivR 7.1(d)(1). Relying on the word-count function of Microsoft Office Word, this document contains 12,974 words. The word-count function was applied to all text, including the caption, headings, footnotes, and quotations.

s/ Potso Mahlangeni-Byndon
Attorney at Law

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2023, I electronically filed the foregoing **BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which sent notification to such filing to the following: Michelle Peters, 804 Omaha Douglas Civic Center, 1819 Farnam Street, Omaha, Nebraska 68183.